UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA            :

     -v-                                          :        09 CR 00168 (S-2) (JFB)

MICHAEL ROMANO, et al.               :

                                                           :

                Defendants.
-------------------------------------------------------X

## POST HEARING MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE TO PRECLUDE THE INTRODUCTION OF EXPERT TESTIMONY REGARDING THE GRADING AND VALUATION OF COINS

SERCARZ & RIOPELLE, LLP
152 West 57th Street, 24th Floor
New York, New York 10019
Telephone: (212) 586-4900
*Attorneys for Defendant Michael Romano*

BACHNER & ASSOCIATES
26 Broadway, Suite 2310
New York, New York 10004
Telephone: (212) 344-7778
*Attorneys for Defendant William Kearney*

SCHIFF HARDIN LLP
900 Third Ave., 23rd Fl.
New York, New York 10022
Tel. (212) 745-0839
*Attorneys for Defendant Michael Schutzman*

**PRELIMINARY STATEMENT**

The defendants submit this Memorandum of Law in support of their motions (1) to preclude the introduction at trial of testimony regarding the grading of coins by Richard Montgomery; and (2) to preclude the introduction of testimony regarding the valuation of coins by Anthony J. Swiatek.

Both Mr. Montgomery and Mr. Swiatek testified at a <u>Daubert</u> hearing on April 11, 2011.

**ARGUMENT**

**I. THE PROFFERED TESTIMONY OF MR. MONTGOMERY DOES NOT MEET THE STANDARD FOR EXPERT TESTIMONY PURSUANT TO FED.R.EVID. RULE 702; NOR DOES IT MEET THE STANDARD FOR RELEVANCE IN ACCORDANCE WITH THE FED.R.EVID. RULE 403**

The defendants are charged in a two count Superseding Indictment. Count One charges a conspiracy to commit mail and wire fraud in violation of Title 18 U.SC. § 1349. Count Two charges a conspiracy to violate the money laundering statutes in that the defendants allegedly conspired to conduct and attempt to conduct financial transactions affecting interstate commerce which transactions, in fact, involved the proceeds of specified unlawful activity, to wit, the conduct alleged in Count One.

The Indictment alleges that the defendants induced customers to purchase coins, *inter alia*, by representing that coins met a certain grading standard, when in fact, they failed to do so. Paragraph 12 of the Indictment alleges, for example, that the defendants informed customers that:

> […] the Benjamin Franklin half-dollars being offered for sale were MS-64+ or better and that the proof Benjamin Franklin half-dollars being offered for sale were MS-67, when actually the condition of

> the Benjamin Franklin half-dollars and proof half-dollars was of lesser quality.

In Paragraph 15 of the Indictment, it is charged that as a result of these allegedly false representations the defendants "misrepresented the grade and value of the Benjamin Franklin half-dollars […] subsequently sold to the customers."

### A. Daubert Analysis

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. Rule 702 (2010).

In other words, the Indictment in this case charges the defendants with a conspiracy to engage in fraud based upon the systematic "overgrading" of coins. Thus, evidence regarding the process of coin grading will assist the jury in understanding the evidence only to the extent that it helps to resolve the factual issue of whether the coins in this case were intentionally overgraded. Yet, we submit that the current system of grading coins is not sufficiently refined to assist the finder of fact in this case.

On direct examination, Mr. Montgomery candidly acknowledged that coin grading is an art rather than a science. (Tr. 27).[1] He further admitted that, at bottom, coin grading is subjective. (Tr. 27).

---

[1] Citations in the form (Tr.  ) refer to the transcript of the Daubert hearing.

2

**Disparities Between Grading Services**

On cross examination, it emerged that while grading services all make use of the 70 point Sheldon grading scale, there is no uniform definition of the criteria for each grade. Thus, for example, the PCGS website defines an MS-64 coin as follows:

> Their grade states few marks/hairlines or a couple of severe one, strikes should be average or above.

(Tr. 61) (MR-1)[2].

In contrast, the ANA website describes an MS-64 coin as follows:

> Has at least average luster and strike for the type, several small contact marks in groups, as well as one or two moderately heavy marks may be present. One or two small patches of hairlines may show. Noticeable scuff marks or defects might be seen within the design or in the field. Overall quality is attractive with a pleasing eye appeal. If copper, the coin may be slightly dull. Color should be designated.

(Tr. 69) (MR-2).

And, the NGC website does not have a specific definition for that grade of coin. (Tr. 70) (MR-3). Indeed, NGC does not rely upon a written definition for each grade of coin that is publicly disseminated. (See MR-3).

Mr. Montgomery further acknowledged that while each grading service keeps its own set of coins (a grading set) on the premises for purposes of reference, there is no single grading set within the industry to guide the various coin graders toward a uniform analysis of the coins. (Tr. 65).

The fact that these disparities in the definition and analysis of the various grades result in disparities between the grading services is demonstrated by Montgomery's grudging admission that population reports for any specific grade of coin yield varying results according to

---

[2] Citations in the form (MR- ) refer to exhibits introduced by the defendant Romano at the hearing.

3

the grading service involved. (Tr. 72). Moreover, the grey sheets, which list the market value of a given coin at a given grade demonstrate that NGC graded coins bring a different value in the market place from PCGS or ANACS coins of the same grade. Mr. Montgomery was compelled to acknowledge that this disparity in market value was some evidence of a disparity in grading criteria. (Tr. 73).

### Disparities Within Each Grading Service

Moreover, disparities exist in the grading of coins within each grading service. They occur because the factors used by any coin grader in evaluating the coins are impossible to objectify. Thus, the appropriate "lustre" of a coin at any particular grade cannot be defined (Tr. 73); nor can the number or extent of "contact marks" present in any particular grade of coin be quantified. (Tr. 74). The third factor, the "strike" of the coin likewise cannot be described in terms that can be replicated or measured. (Tr. 74-75). The final factor, "eye appeal," is the most subjective of all. (Tr. 75).

While Mr. Montgomery testified that his grading service seeks to achieve a "consensus grade," the process may begin with a discrepancy in the grade that different NGC graders assign to the same coin. The resulting "consensus" is not based upon a finding that any grader was incorrect, and is limited to employees of NGC all of whom are presumably using the NGC standard to grade the coin within the same brief period of time. Mr. Montgomery acknowledged that there are no efforts currently afoot in the market place to achieve consensus grading between grading services. (Tr. 87).

As a result, the ANA Board of Governors recognized in 1986 that grading differences of less than four points on the Sheldon scale can be "reasonable differences" between graders. (Tr. 92) (See Exhibit MR-4).

And, the most recent statement by the ANA on this subject, in 2006, does not undermine this conclusion:

> "[…] in the past it has been suggested that a difference of two points, three points, or some other difference in this category indicated over grading, but the situation is not that simple."

(Tr. 93) (See MR-5).

**The Margin Of Error**

Counsel offered into evidence for purposes of the hearing the spreadsheet compiled by NGC based upon its grading analysis of the coins belonging to 10 customers in this case. (See MR-6).

The first significant finding is the degree to which NGC graders differed among themselves. While Mr. Montgomery suggested that within the mint state categories a difference of one point was "generally" confined to one point. However, between grading services or among individual graders, this analysis was not born out by the grading that took place in this case. (Tr. 48).

Of the 1,823 coins graded, NGC graders differed among themselves on 158 occasions. On 123 of these occasions, the difference was limited to one grade. A difference of two grades occurred on four occasions; and on eight other occasions, the difference was three full grades. There were an additional 23 instances where one or more of the NGC graders graded a coin, while other NGC graders found that the coin had been improperly cleaned or was otherwise inappropriate for grading.

Under these circumstances, it becomes critical to know whether the disparity between the grades attributed to the coins by Michael Romano and sold at that grade by the defendants; and the NGC grades, are such as to support the allegations of a deliberate pattern of

5

over grading rather than the good faith differences of opinion that might occur among reputable graders within the same grading service; or between equally reputable grading services.

In this regard, it must be noted at the threshold that while coins were sold by the defendant to his various customers from March 1997 through in or about November 2008, all of the coins were graded by NGC in 2010.  Thus, testimony regarding the condition upon sale, and the chain of custody of these coins, will be critical in determining whether the NGC grades represent a fair comparison with the defendants' grades.  Mr. Montgomery, himself, acknowledged that from a grading standpoint coins are as perfect as they're ever going to be at the moment that they are created, and that "it's all downhill from there." (Tr. 54).

Leaving aside issues involving the chain of custody; and removing from the analysis those coins deemed by NGC to be ungradeable, by our calculation, 29% of the coins were graded by the defendants at the same level or lower than the NGC grade; 65% were graded within one level of the NGC grade; 83% were graded within two grades, and a full 90% of the coins were within the four grade margin of error.

Under these circumstances, we respectfully submit that the system of coin grading has not reached a sufficient level of refinement to permit testimony regarding disparities between the grades applied by the defendants and the NGC grades in support of a claim of intentional overgrading.

### B. Rule 403 Analysis

In determining whether to admit expert testimony, the Court must consider not only the threshold standard for the admissibility of expert testimony under Fed.R.Evid. Rule 702, but must also balance the probative value of such evidence against its potential for prejudice under Fed.R.Evid. Rule 403.  See United States v. Rahman, 189 F.3d 88, 136 (2d Cir. 199)(per

6

curiam)(expert testimony properly excluded under Rule 403); Weinstein's Federal Evidence, §702.02 [5] (2010) ("expert testimony like all other evidence, may also be excluded under Rule 403 if it would confuse or mislead the trier of fact or if its probative value would be substantially outweighed by the risk of unfair prejudice to the other party.").

Even if coin grading is an appropriate subject for expert testimony; and, even if Mr. Montgomery is well qualified to testify regarding its application, the Court must still determine whether his testimony is relevant on the facts in this case.

We respectfully submit that, given questions involving the condition (chain of custody) of the coins, the margin of error among reputable grading services, and the fact that fully 90% of the gradable coins in this case fall within the four point margin of error, it would be inappropriate to allow expert testimony to suggest that the defendants' coins were intentionally overgraded. There is every likelihood that the jury would attribute to such testimony far more weight than it ought to be given. Accordingly, even if testimony regarding coin grading has reached a sufficient level to warrant admission in most cases, we respectfully submit that in this case, it does not meet the standard of relevance under Fed.R.Evid. Rule 403.

**II. THE TESTIMONY OF ANTHONY J. SWIATEK REGARDING THE VALUE OF THE COINS MUST BE PRECLUDED ON THE BASIS THAT (1) THE METHODOLOGY THAT HE EMPLOYED TO VALUE THE COINS FALLS SHORT OF THE DAUBERT STANDARD; (2) THE METHODOLOGY WAS NOT EMPLOYED IN A CONSISTENT AND OBJECTIVE MANNER, AND (3) THE METHODOLOGY WAS INAPPROPRIATE TO THE FACTS OF THIS CASE. MOREOVER, THE TESTIMONY FAILS TO MEET THE STANDARD OF RELEVANCE UNDER RULE 403**

Assuming that the Court permits the government to offer the testimony of Mr. Montgomery regarding the valuation of coins, the introduction of expert testimony regarding coin valuation will add levels of subjectivity beyond those involved in coin grading.

7

Mr. Swiatek himself described coin grading as "very subjective" (Tr. 135) and acknowledged that when seeking to attribute a value to a "raw" coin "I could only estimate with a question mark of what they might be worth." (Tr. 133).  Mr. Swiatek testified that he preaches the nostrum "buy the coin not the holder." (Tr. 144).  He explained it as follows:

> The eye appeal might not be what you like.  It might not be flashy enough for you, or a person might not be fully aware of the lustre states of those coins and maybe they don't want to buy that coin.  Maybe a coin in a certain lustre state will only look satiny and somebody is looking for something brilliant semi-mirror surfaces.

(Tr. 134).

Yet, Mr. Swiatek acknowledged that he relied <u>entirely</u> upon the grades attributed to the coins by NGC and never even saw the coins in their encapsulated form after they were graded. (Tr. 130).

### A. The Methodology Employed By The Witness Failed To Meet The Standards Of Rule 702

In seeking to determine the value of the coins, Swiatek took the list of coins on the NGC spreadsheet and examined the prices for such coins in the coin dealer newsletter; the certified coin dealer newsletter; and, in the case of rare coins, the auction prices for coins of comparable grade.

The coin dealer newsletter known as the "Grey Sheets" was described by Mr. Swiatek as a "wholesale pricing guide."  (Tr. 123).

The government offered a recent copy of the grey sheets as GX-1.  At the bottom of the exhibit, the notation appears that the weekly newsletter "reports the national dealer-to-dealer wholesale market."  According to the witness, dealers use the grey sheets in order to view the bid prices and the ask prices of coins they may be interested in.  (Tr. 123-24).  The grey

8

sheets provide prices for "raw" coins as well as those that are "slabbed" (encapsulated). (Tr. 124).

Swiatek described the certified dealer newsletter ("Blue Sheet") as a wholesale pricing guide for encapsulated coins which are purchased "sight unseen." (Tr. 126-27). Again, the blue sheets provide bid and ask prices for coins of any given grade. See GX-2. (The ask price is called "market price.")

The methodology employed by this witness failed to meet the standards of Rule 702 in at least two significant respects:

First of all, while a complete reliance upon the grey sheets or the blue sheets may be appropriate in providing a <u>range of prices</u> for any given coin, the witness provided no meaningful explanation for his decision to offer a <u>single value</u> for each coin that he evaluated.

Secondly, the witness offered absolutely no explanation for his decision whether to use the grey sheets, the blue sheets, or some combination thereof, in reaching a single value for any given coin. The following colloquy demonstrates the utter absence of a consistent methodology which obtained widespread acceptance among coin graders, and could, therefore, supply a basis for an expert conclusion concerning the value of a coin:

> Q: When you value the coins as to each coin on your spreadsheet, you did not provide a bid and an ask price, did you?
>
> A: I provided – I would try to provide an ask price. If the difference between the grade sold and NGC's grading was so far off, I use the bid. If it wasn't that far or I tried to use an ask to be as fair as I could with the pricing.
>
> Q: On the subject of fairness, if the grey sheets provide a range, bid versus ask, and if you never laid eyes on any one of these coins, how did you know which was the more accurate price according to the grey sheets? The bid price, the ask price or some certain price in between?

9

> A: I also would use my experience in buying and selling coins.
>
> I – as I mentioned to you, if the coin had an NGC of Mint State 61 and it was sold as a Mint State 64, I was inclined to go to the bid price, because a 61 coin is no big deal and it's an extremely rare coin, Mint State meaning there is no wear on the coin.

(Tr. 145-46).

The United States Supreme Court has identified five non-exclusive factors that should be considered before expert testimony is admitted:

1. Whether the theory or technique has been tested;

2. Whether it has been subjected to peer review and publication;

3. The known or potential error rate;

4. The existence and maintenance of standards controlling the technique's operation; and

5. It's general acceptance within the scientific community.

See Kumho Tire Company Ltd. v. Carmichael, 526 U.S. 137, 149 (1999); Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579 at 592-94 (1993).

Clearly, Mr. Swiatek's methodology is so idiosyncratic that it amounts to nothing more than a personal opinion.

**The Methodology Was Not Consistently Applied**

The witness was not able to offer a logical or consistent explanation for his decision to use either the blue sheets or the grey sheets; or, for his decision to value the coin closer to the bid price or the ask price according to the document upon which he was placing his reliance. Indeed, his attempts at an explanation were incomprehensible:

> Q: How did you know in which instances to use the blue sheets and in which instances to use the grey sheets?

10

> A: If you have a common coin, like Franklin Half Dollars or Walking Liberty proofs, a lot of the dealers in the market place are buying by blue sheets because there is an awful lot of that material available. So that buying by blue sheets there's no great demand for it and there is a big supply.
>
> Q: Well, was the assignment that you were given by the government to provide an expert opinion about what most of the dealers who were buying these coins do? Or were you ask to provide an expert opinion as to the value of the coin?
>
> A: I was asked an expert opinion on the value which I did put down for each coin.
>
> Q: And that value that you put down for each coin was a single number, not a range. Am I correct?
>
> A: Yes.
>
> Q: And it was entirely within your discretion whether to use the blue sheet or grey sheet with regard to any particular coin. Is that correct?
>
> A: Yes, but I used the grey sheet most of the time.

(Tr. 146-47).

### The Methodology Was Inappropriate

Moreover, it appears that the witness relied upon the wrong publications in order to determine the value of the coins as sold by the defendants in this case.

Mr. Swiatek first claimed he was unaware of whether the coins he was being asked to value were sold in the wholesale – as opposed to the retail – market or, whether the coins as sold by the defendant were raw coins or whether they were encapsulated when sold. (Tr. 130-31).

11

After being pressed on cross examination, Mr. Swiatek acknowledged that the coins sold by the defendants were raw coins. (Tr. 131).

Yet, it is beyond dispute that the defendants in this case were selling raw coins to retail customers. Thus, Mr. Swiatek was valuing the coins based upon prices for the wrong type of coins in the wrong market place.

Moreover, while the witness acknowledged the existence of "Trends," a retail pricing guide published by Coin World Publications, the "New York Times" of the coin industry, the witness never relied upon "Trends" as a source document for his analysis. (Tr. 147-49).

When asked to reconstruct the method for his analysis, the witness could only say:

"I'm looking at a list. I'm just putting a value down from the list which I thought was extremely fair."

(Tr. 151).

While the witness may have thought that his analysis was fair, more is required in order to warrant admission. The analysis must be based upon an appropriate methodology consistently applied in a manner that would give the Court confidence that any expert applying the same facts would reach the same result. Such is not the case, here.

**Rule 403 Analysis**

Assuming, *arguendo*, that this method of coin valuation is appropriate in some other case, it should be prohibited in this case, given the admitted level of subjectivity in coin grading and the degree to which the coins in this case fall within the margin of error for the grading analysis.

Mr. Swiatek's testimony does not provide any probative value beyond merely applying either the blue sheets or grey sheets to the NGC grades. Yet, the prejudice which arises from this testimony will be enormous. There is every danger that even if the limits of his method

of evaluation are exposed by cross examination, the jury may rely simply upon the fact that a man with long standing experience in the coin industry finds that what the defendants did in this case was "unfair."

This is not an appropriate basis upon which to render a verdict on the charges in this case.

## **CONCLUSION**

For all the foregoing reasons, defendants respectfully request that the Court grant their in limine motion.

Dated: April 26, 2011

Respectfully submitted,

_____/S/_____
MAURICE H. SERCARZ
Sercarz & Riopelle, LLP
152 West 57th Street, 24th Floor
New York, New York 10019
Telephone:  (212) 586-4900
*Attorneys for Defendant Michael Romano*


_____/S/_____
MICHAEL F. BACHNER
Bachner & Associates
26 Broadway, Suite 2310
New York, New York 10004
(212) 344-7778
*Attorney for Defendant William Kearney*

_____/S/_____
PATRICIA A. PILEGGI
SCHIFF HARDIN LLP
900 Third Ave., 23rd Fl.
New York, New York 10022
Tel. (212) 745-0839
*Attorney for Defendant Michael Schutzman*