

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

LTG:CAO

*610 Federal Plaza*
*Central Islip, New York  11722*

November 1, 2011

**VIA HAND DELIVERY AND ECF**

The Honorable Joseph F. Bianco
United States District Court
Eastern District of New York
920 Federal Plaza
Central Islip, New York 11722

    Re:  United States v. Michael Schutzman, et al.
          Criminal Docket No. 09-168 (JFB)

Dear Judge Bianco:

    The government submits this sentencing memorandum in response to Defendant Michael Schutzman's October 11, 2011 sentencing memorandum ("Schutzman Memorandum").  Consistent with paragraph 5(b) of the plea agreement, the government does not oppose the downward departure motion contained in that letter. See Schutzman Memorandum at 22-25. For the same reason, the government also agrees that a sentence in United States Sentencing Guidelines ("USSG") Zone B will be reasonable.  The government takes no position as to Schutzman's motion to seal portions of the Schutzman Memorandum and its supporting exhibits.

    The government does not agree with the portion of the Schutzman Memorandum that discusses vulnerable victims. See Schutzman Memorandum at 18-22.  Paragraph 2 of the plea agreement expressly called for application of a sentencing enhancement predicated upon "vulnerable victims." See USSG § 3A1.1.  Beyond that agreement, the law and the facts support applying the "vulnerable victim" enhancement to Schutzman's circumstances.

**I.   Background**

    As the Court recalls, the defendants engaged in schemes to fraudulently obtain money by making false statements to the customers of Wall Street Rare Coins, Atlantic Coin Galleries and Northeast Gold and Silver in connection with the sale of coins. The superseding indictment sets forth the schemes to defraud in paragraphs 11 through 16.  These paragraphs, inter alia, describe

knowingly selling overgraded coins and give examples of the lies that they utilized to make those sales.

At the Michael Romano and William Kearney trial, various witnesses described the vulnerable nature of the victims. Multiple employee witnesses testified about how many of the victims were elderly. See Trial Transcript ("Tr.") 411 (Michelle Stumpf), 865 (Patric Coleman), 1170 (Daren Mutone). In general, other salesmen described their victims as gullible, see Tr. 1195 (Daren Mutone), and easily confused, see Tr. 865 (Patric Coleman), 1170 (Daren Mutone). Other victims described their disabilities, such as nascent blindness and limb amputation. See Tr. 1917-1918 (Terry Rindall). Still other victims described their reliance upon the salesmen. See Tr. 642 (Richard Bruni), 988-989 (Frank Miser), 1316 (Sharon Oldham), 1521, 1538 (Richard Bentzinger), 1898 (Terry Rindall). Some of these victims described the great, but misplaced, trust that they had in their salesmen. See Tr. 975 (Frank Miser), 1911 (Terry Rindall).

Some of these victims confided personally to Schutzman, who exploited their vulnerability. Tr. 1316 (Sharon Oldham).

| | |
|---|---|
| Oldham: | I started purchasing around 2007 to 2009. |
| Q: | Is it fair to say you were on a fixed income during that period? |
| Oldham: | Basically I had stayed home with my children for 12 years before my husband passed away, and after he died I had a fixed payment from the sale of his share in the business. It took me a year to get my licensure renewed to get back to work in my profession. |
| Q: | So at the end of a year after receiving one of these payments, what would your financial position be? |
| Oldham: | I would start to run out of cash before the next payment was due. I had to be very careful to make it stretch. |
| Q: | Did the calls stop from Mike Scott[1] at any point? |
| Oldham: | No. He was aware that I did discuss with him the structured settlement from my husband's business. He encouraged me to sell something else, to get cash from wherever I could, from |

---

[1]"Mike Scott" and "Michael Scott" are two of the false names that Schutzman would use in his conversations with victims.

```
                    my credit card. And even possibly to tap my
                    children's educational accounts.
        Q:          To what end were you trying to get this
        money?
        Oldham:     To purchase coins [from him].
```

Tr. 1316-1317 (Sharon Oldham).

## II.  The Legal Standard

### A.  Schutzman's Victims Were Both "Unusually Vulnerable" and "Particularly Susceptible"

USSG § 3A1.1 controls the "vulnerable victim" enhancement. The application notes to § 3A1.1(b)(1) state that the term "vulnerable victim" means "a person (A) who is a victim of the offense of conviction ... and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b)(1) cmt. app. n.2; see also United States Sabhnani, 599 F.3d 215, 253 (2d Cir. 2010). Age is clearly implicated by the facts in this case. Most of the victims were elderly. Indeed, it is undisputed that the salesmen's leads were purchased to focus upon older potential customers. The last clause, "particularly susceptible," is also implicated in Schutzman's circumstances. In particular, the class of "grieving widow" has been affirmed as the basis for this enhancement. See United States v. Harris, 38 F.3d 95, 99 (2d Cir. 1994).[2] In short, Schutzman's victims were "unusually vulnerable" and "particularly susceptible" to the fraud. The Court should therefore focus on whether Schutzman knew or should have known about the status of his victims.

### B.  Knowledge: Schutzman's Conduct and "Reloading"

Schutzman argues that he neither knew nor should have known that his victims were vulnerable. This argument is not supported by the evidence before the Court. As quoted above, supra at 2, Schutzman gained intimate, personal knowledge from victim Sharon Oldham. That knowledge was not merely collected.

---

[2] There are certain other class-focused limitations to this enhancement that are not raised by Schutzman. See, e.g., United States v. McCall, 174 F.3d 47, 50 (2d Cir. 1998). Because the defense instead focuses on knowledge, and the classes of victims are well-defined here, the Court need not reach the McCall analysis.

Instead, the evidence shows that Schutzman synthesized that knowledge in order to suggest additional methods as to how Mrs. Oldham could liquidate her family's assets. After fully exploiting the details of the deceased husband's structured settlement, Schutzman turned his attention to other assets. These other assets, including college funds, were tapped in order to continue buying more and more of these coins. Schutzman fleeced Mrs. Oldham in a thorough, detailed and personalized manner. Even more telling, the victimization continued.

This repeat victimization is sometimes known as "reloading," which further highlights Schutzman's knowledge. Reloading is the process by which a fraud scheme, by design, focuses on repeat sales to prior victims. See United States v. Jackson, 95 F.3d 500, 508 (7th Cir. 1996). Jackson involved a telemarketing scheme. In that case, the Seventh Circuit affirmed the district court's analysis that the "reloading" activities engaged in by the defendants, inter alia, supported the knowledge prong of the Section 3A1.1(b) analysis. Id. In this case, as in Jackson, Schutzman made most of his sales to repeat customers.

Upon the government's research, every Circuit, including the Second Circuit, has adopted the same analysis. "[A]n important part of [a] scheme [i]s the re-loading process, whereby individuals who had already been victimized by the scheme were contacted ... more times and defrauded into sending more money to the [defendants]." United States v. O'Neil, 118 F.3d 65, 75-76 (2d Cir. 1997); accord United States v. Randall, 162 F.3d 557, 560 (9th Cir. 1998) (vulnerable victim enhancement appropriate because "[t]he 'reloading' scheme at issue here seeks out people who have a track record of falling for fraudulent schemes"); United States v. Robinson, 152 F.3d 507, 510-12 (6th Cir. 1998) (applying vulnerable victim enhancement to reloading scheme).

The "reloading" nature of these schemes is well-established by the evidence at the trial. The sales scripts laid out an escalating series of promises and sales based upon repeat sales. Indeed, if some other salesman sold to a victim that you had initiated, you would also get a commission. Recent sentencing courts have correctly reached the "reloading" conclusion based upon very similar evidence. See, e.g., United States v. Olumuyiwa, No. 09-50603, 406 Fed. Appx 243, 2010 Wl 5376343 at *1 (9th Cir. December 21, 2010); but see United States v. Llamas, 599 F.3d 381, 389 (4th Cir. 2010) (counseling that the sentencing court should expressly articulate its "reloading" rationale). The Court should find that these

defendants engaged in a reloading scheme that involved otherwise vulnerable elderly, gullible and easily confused victims.

The success of this aspect of the scheme should not be underappreciated.

> [F]rom the standpoint of the overall financial success of their venture, the reloading tactic was very efficient and highly profitable. It is clearly the intent of the § 3A1. 1(b) enhancement . . . to punish such optimizing behavior more harshly.

Jackson, 95 F.3d 500, 508 (7th Cir. 1996).

Rather than passively participating, Schutzman engaged in repeated "optimizing" behavior. Sometimes this meant that he took the time to learn everything about a widow before helping her to clear out her children's education fund. Other times, this meant that Schutzman followed the company policy of "reloading" upon the "old, confused and gullible." See, e.g., Tr. 1170 (Daren Mutone). In both areas, Schutzman repeatedly demonstrated his own constructive and actual knowledge of the vulnerability of his victims. That knowledge should not be ignored and it establishes Schutzman's increased culpability.

## IV. Conclusion

For the foregoing reasons, consistent with the USSG calculations in the plea agreement, the applicable law and the facts, the government requests that the Court impose the vulnerable victim enhancement. As set forth earlier, the government does not oppose the departure request and agrees that a Zone B sentence is reasonable.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

By:   _____/s/_____
Christopher A. Ott
Assistant U.S. Attorney
(631) 715-7870